## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 14-328 (JRT/FLN) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER ADOPTING THE REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE** |
| v. | |
| JEFFREY ALAN PETERSON, | |
| Defendant. | |

Sarah E. Hudleston, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for plaintiff.

Kyle D. White, **ATTORNEY AT LAW**, 332 Minnesota Street, Suite W-1610, St. Paul, MN 55101, for defendant.

Jeffrey Alan Peterson ("Peterson") was indicted on October 15, 2014, on charges of receipt and possession of child pornography. In the course of the FBI's investigation into Peterson's actions, Child Exploitation Task Force Officer Dale Hanson ("TFO Hanson") and several other law enforcement officers executed a search of Peterson's home on October 3, 2013, pursuant to a search warrant. During the search, the officers found and seized three computers, including a laptop that contained a child pornography video TFO Hanson had traced to Peterson using detection software. TFO Hanson and another officer also questioned Peterson in his kitchen during the search. Peterson now moves to suppress his statements and the evidence seized during the October 3, 2013 search.

On January 15, 2015, United States Magistrate Judge Franklin L. Noel issued a Report and Recommendation ("R&R"), recommending that the Court deny Peterson's motions to suppress.  Peterson timely objected to the R&R, and this matter is now before the Court on Peterson's objections.  After reviewing *de novo* the issues to which Peterson objects, the Court concludes that even when all six Griffin factors are analyzed, Peterson was not in custody and not entitled to Miranda warnings on October 3, 2013.  Thus, the Court will overrule Peterson's objections, adopt the Magistrate Judge's R&R, and deny Peterson's motions to suppress.

## BACKGROUND

### I.    OCTOBER 3, 2013 SEARCH

On August 18, 2013, TFO Hanson detected a computer using the FrostWire peer-to-peer file sharing program to share files that had been flagged by the FBI as child pornography.  After verifying that his computer could fully download child pornography videos from the computer using FrostWire, TFO Hanson contacted the Hennepin County Attorney's Office.  The Hennepin County Attorney's Office issued an administrative subpoena to Windom Net, an internet service provider in Windom, Minnesota, to identify the IP address subscriber.  Windom Net responded that the IP address of the computer using FrostWire was assigned to Jeffrey Alan Peterson at 2212 River Road in Windom, Minnesota.  TFO Hanson ran Peterson's name and address through the Minnesota Predatory Offender Database and discovered that Peterson was a registered sex offender.

Based on this information, on October 1, 2013, TFO Hanson obtained a search warrant for Peterson's residence.

TFO Hanson and four other officers executed the search warrant on October 3, 2013.  No one was present when the officers arrived at Peterson's home.  The officers knocked on the front door and announced their presence but received no response.  Because the front door was unlocked, the officers then entered the home and performed their search.  They seized three computers from Peterson's residence, one of which was a laptop containing a video TFO Hanson had been able to fully download from Peterson's FrostWire file sharing program.

Upon finishing their search, the officers called Peterson's employer and requested that Peterson return to his home.  Peterson returned to his residence and met with TFO Hanson and Special Agent Glenn Moule in his kitchen.  Both TFO Hanson and Special Agent Moule were dressed in plain clothes and sitting across the kitchen table from Peterson during the interview.  Peterson was never handcuffed or physically restrained on October 3, 2013.  Throughout the interview, the other three officers at the residence remained in Peterson's garage, not visible from the kitchen.

Before he began to ask Peterson questions, TFO Hanson showed Peterson the search warrant and turned on a recorder.  TFO Hanson also explained that Peterson was "not under arrest.  I'm doing an investigation here, but you're not under arrest and I'm not planning on arresting you today.  And if you don't want to stay here and talk to me, you don't have to.  It's your choice."  (Audio Recording of October 3, 2013 Interview ("Interview Recording") at 1:21-1:30.)  Peterson responded, "No, that's fine.  I – I've

done lots of things, but I haven't done anything for quite a while." (*Id.* at 1:30-1:35.)

TFO Hanson then stated, "OK, I just want to make it clear that you don't have to stay

here and can go back to work." (*Id.* at 1:35-1:38.)   Peterson told TFO Hanson, "I

understand." (*Id.* at 1:38-1:40.)

Approximately half an hour into the interview, when the officers were discussing

folders on Peterson's computer appearing to contain child pornography, TFO Hanson

reiterated, "I'm just kind of putting it out there, giving you the chance, if you want to own

up to it or if you want to admit to it, it's your choice.  I'm not, obviously not forcing

you." (*Id.* at 31:24-31:31.)  Peterson replied, "No, you're not forcing me to do anything."

(*Id.* at 31:32-33.)  TFO Hanson followed up by stating, "Again, you don't have to – you

don't have to even continue talking if you don't want to." (*Id.* at 31:33-37.)   He

explained, "I'm just asking a question.  If you choose – if you choose to answer them, it's

your choice." (*Id.* at 32:04-32:08.)  In response, Peterson stated, "No, I understand that."

(*Id.* at 32:09-10.)

## II.    REPORT AND RECOMMENDATION

Peterson moved to suppress any evidence obtained through the search of his home

and any statements he made to officers during the interview on October 3, 2013.  (Mot. to

Suppress Evidence Obtained through Illegal Search & Seizure, Nov. 19, 2014, Docket

No. 21; Mot. for Suppression of Statements by Def., Nov. 19, 2014, Docket No. 22.)

Peterson contends that he was in custody during the October 3 questioning and was not

provided with *Miranda* warnings.  The Magistrate Judge held a hearing on Peterson's

motions on December 11, 2014.  At the hearing, TFO Hanson testified that part of his work for the FBI Child Exploitation Task Force involves running detection software to identify peer-to-peer file sharing of child pornography.  He described using that detection software to identify Jeffrey Alan Peterson's computer in Windom, Minnesota as the source of a video depicting a 4-6 year old girl performing oral sex on a male adult.  TFO Hanson explained that this video, combined with Peterson's status as a registered sex offender, led him to obtain a warrant to search Peterson's residence.  TFO Hanson went on to describe the October 3, 2013 search and interview with Peterson.  The United States also introduced three pieces of evidence at the hearing before the Magistrate Judge: the warrant for the search of Peterson's residence, a photograph of Peterson's kitchen, and an audio recording of the interview between TFO Hanson, FBI Special Agent Glenn Moule, and Peterson.  (Ex. & Witness List, Dec. 11, 2014, Docket No. 35.)

Following the hearing, the Magistrate Judge issued an R&R recommending that the Court deny Peterson's motions to suppress.  (R&R at 1, 7-8, Jan. 15, 2015, Docket No. 41.)  Noting that Peterson did not make any particularized challenge to the warrant for the October 3, 2013 search, the Magistrate Judge explained that the warrant was either supported by probable cause or, if the supporting affidavit lacked probable cause, the search was nonetheless valid because it was conducted pursuant to the officers' good-faith belief that the search warrant was valid.  (*Id.* at 4-5.)

Additionally, the Magistrate Judge concluded that Peterson's statements should not be suppressed because he was not in custody during the questioning and therefore was not entitled to a *Miranda* warning.  (*Id.* at 5-7.)  The R&R uses a broad totality of the

circumstances analysis, finding that TFO Hanson's reminders that Peterson could leave at any time, the setting of the interview (Peterson's kitchen), and the lack of any significant restrictions to Peterson's movement, all support denying Peterson's motion to suppress his statements.  (*Id.* at 6-7.)

## ANALYSIS

### I.  STANDARD OF REVIEW

Upon the filing of a report and recommendation by a magistrate judge, a party may "serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Civ. P. 72(b)(2); *accord* D. Minn. LR 72.2(b).  "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).  "The objections should specify the portions of the magistrate judge's report and recommendation to which objections are made and provide a basis for those objections."  *Mayer v. Walvatne*, No. 07-1958, 2008 WL 4527774, at *2 (D. Minn. Sept. 28, 2008).

### II.  PETERSON'S OBJECTIONS TO THE R&R

Peterson objects that the Magistrate Judge should have applied the six factors outlined in *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990), to determine whether Peterson was in custody and therefore entitled to *Miranda* warnings on October 3, 2013.  (Def.'s Objection to R&R ("Objections") at 2, Jan. 28, 2015, Docket No. 47.)  When evaluating whether a suspect was in custody at the time of police questioning, the ultimate issue is "whether there was a formal arrest or restraint on

freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal alterations and quotation marks omitted). In *Griffin*, the Eighth Circuit identified six "common indicia of custody . . . the presence or absence of [which] have been influential in this court's assessment of the totality of the circumstances surrounding an official interrogation." 922 F.2d at 1349.  The six factors are:

(1)   whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

(2)   whether the suspect possessed unrestrained freedom of movement during questioning;

(3)   whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4)   whether strong arm tactics or deceptive stratagems were employed during questioning;

(5)   whether the atmosphere of the questioning was police dominated; or,

(6)   whether the suspect was placed under arrest at the termination of the questioning.

*Id.*

"The first three of these factors may be fairly characterized as mitigating factors . . . ." *Id.*  On the other hand, "the affirmative presence of one or more of [the last three] factors during questioning would tend to aggravate the existence of custody." *Id.* Although "[t]here is no requirement . . . that the *Griffin* analysis be followed ritualistically in every *Miranda* case," *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004), the Court concludes that this case is well suited to an application of the *Griffin* factors and will assess their presence in this case.

### 1.    Advice from the Officers

The first factor courts consider in making custodial determinations is whether the officers informed the suspect that he was not under arrest and need not answer any questions.  *Griffin*, 922 F.2d at 1349-50.  "The most obvious and effective means of" communicating this "is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will."  *Id.* at 1349.

As the Magistrate Judge correctly identified, TFO Hanson advised Peterson on multiple occasions throughout the interview that he did not need to speak with the police if he did not want to do so.  In fact, TFO Hanson advised Peterson as to each of the three subparts of the first *Griffin* factor: that questioning was voluntary, he was free to leave, and he was not under arrest.  At the beginning of the interview, TFO Hanson informed Peterson, "you're not under arrest and I'm not planning on arresting you today.  And if you don't want to stay here and talk to me, you don't have to.  It's your choice." (Interview Recording at 1:21-1:30.)  After Peterson responded that he was willing to speak with the officers, TFO Hanson reiterated, "I just want to make it clear that you don't have to stay here and can go back to work."  (*Id.* at 1:35-1:38.)  Approximately thirty minutes into the interview, TFO Hanson again advised Peterson that answering questions is "your choice" and "again, you don't have to continue talking if you don't want to."  (*Id.* at 31:29-30, 31:33-37.)  On each of these occasions, Peterson affirmatively responded that he understood and continued talking with the officers.

Peterson objects that the R&R did not include TFO Hanson's statement at the beginning of the interview that TFO Hanson was "doing an investigation here," which Peterson claims is indicative of a custodial environment.  Having reviewed the audio recording of the interview, however, the Court concludes that the Magistrate Judge's omission of the phrase "I am doing an investigation here" in the R&R is inconsequential. The R&R quotes relevant portions of the beginning of the interview, and even when "I am doing an investigation here" is included as part of the context, the connotation of TFO Hanson's statement does not change.  His full explanation to Peterson at the beginning of the interview, with that statement included, is:

> Just to let you know, just right now, **you're not under arrest.**  You know, I'm doing an investigation here, **but you're not under arrest** and I'm not planning on arresting you today.  **And if you don't want to stay here and talk to me, you don't have to.**  It's your choice.

(*Id.* at 1:20-1:30 (emphasis added).)  In light of the express statements surrounding "I'm doing an investigation here" – that Peterson was not under arrest and not required to stay and talk to the officers – the Court finds that no "reasonable person would have understood himself to be in custody," *Czichray*, 378 F.3d at 826, based solely on the phrase "I'm doing an investigation here."  Therefore, the Court will overrule this challenge by Peterson to the R&R.

Based on TFO Hanson's clear, repeated advice that Peterson was not under arrest and need not continue to speak with the officers, the Court finds that the first *Griffin* factor militates against a finding that Peterson was in custody.  This advice is significant to a custodial determination, because the Eighth Circuit has concluded that

abundant advice of freedom to terminate the encounter should not be treated merely as one equal factor in a multi-factor balancing test . . . .  That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview.  So powerful, indeed, that no governing precedent of the Supreme Court or this court, or any case from another court of appeals that can be located . . . holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.

*Id.* at 826.  As a result, the Court considers TFO Hanson's advice to be a significant indicium that Peterson was not in custody.

### 2.     Unrestrained Freedom of Movement

The second factor courts look to when determining whether a suspect was in custody during police questioning is whether the suspect's freedom of movement was restricted in any way.  *Griffin*, 922 F.2d at 1350-51.  "Circumstances of custody are frequently obviated where the suspect's freedom of action is not curtailed during questioning."  *Id.* at 1350.  Restraints associated with formal arrest include being "escorted or chaperoned during questioning," "being placed under guard during questioning, or told to remain in the sight of interrogating officials," or being questioned in a locked room.  *Id.* at 1350-51.

In this case, Peterson's movement was not restrained by the officers.  He was interviewed at his kitchen table, without handcuffs or other physical restraints.  The kitchen was open to the living room, including direct access to Peterson's front door.  TFO Hanson informed Peterson that he could leave at any time.  There is no indication that Peterson attempted to voluntarily leave during the interview.  Finding no evidence of the officers restraining Peterson's freedom of movement on October 3, 2013, the Court

concludes that the second *Griffin* factor supports a finding that Peterson was not in custody at the time of the interview.

### 3.  Who Initiated the Interview

Third, "when the confrontation between the suspect and the criminal justice system is instigated at the direction of law enforcement authorities, rather than the suspect, custody is more likely to exist." *Id.* at 1351.  That law enforcement initiates the contact does not automatically indicate a custodial environment.  Where a suspect voluntarily approaches officers or investigators, however, courts have "frequently found custody lacking." *Id.*

In this case, the officers clearly reached out to Peterson by calling his workplace and requesting that Peterson return to his home.[1]  The call to Peterson's employer could be construed as the first contact between the parties, and it was initiated by the officers conducting the investigation.

At that point, however, Peterson was not in the same location as the officers and questioning had not yet begun.  The officers' questioning did not commence until Peterson "voluntar[ily] respon[ded] to their request to speak with him." *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985).  In *Davis*, though, police officers left a note

---

[1] Peterson objects to the R&R's characterization that the officers called Peterson at work, rather than stating that they called his employer.  The Court finds that Peterson's description of the officers contacting his employer, not Peterson directly, most accurately reflects the testimony provided by TFO Hanson at the hearing on December 11, 2014.  The Court notes, however, that this fact does not alter the Court's analysis with respect to whether Peterson was in custody at the time of TFO Hanson's questioning.  The Court will consider the officers' call to Peterson's workplace – irrespective of whether the officers spoke to Peterson or his employer – as officer-initiated contact with Peterson for purposes of the third *Griffin* factor.

with the suspect's grandmother requesting that the suspect come to speak with the police, and the suspect complied with the request two days later. *Id.* at 169-70. The court concluded that the suspect "was not in 'custody' for *Miranda* purposes" because his "initial contact with police was the result of his voluntary response to their request to speak with him." *Id.* at 171. The court pointed to the two-day delay as evidence of "[t]he total absence of any coercion occasioned by the police note." *Id.*

The mitigating factors cited by the court in *Davis* are not present in this case. First, although law enforcement left a message requesting that the suspect speak with them in both cases, the relationship between the suspect and the third party contacted by the officers is very different in each case. While the suspect in *Davis* may have felt at liberty to ignore a note left with his grandmother at her house, the Court suspects that many people would feel less comfortable disregarding a conversation with their employer in which the employer explained that the police had just called and would like the employee to leave work to answer questions.

Second, and perhaps more importantly, there was not a similar delay between the police contacting the third party and the suspect approaching the police. The *Davis* court singled out the two-day delay as support for the finding that the suspect was voluntarily going to speak with the police. Here, Peterson contends that he "felt forced to return home as five officers were in his home, searching and seizing evidence." (Mem. in Supp. of Mot. to Suppress Statements at 1, Dec. 15, 2014, Docket No. 38; Objections at 3.) If Peterson felt pressured to return home due to the search being conducted, that fact could impact the extent to which his compliance with the officers' request to return home was

purely voluntary.  Indeed, Peterson immediately complied with the officers' request to return home, leaving work in the middle of the morning on a weekday.  Particularly because Peterson was aware that a search of his residence was ongoing, the Court acknowledges that Peterson may well have felt that his freedom of choice was compromised.

Ultimately, the Court concludes that this third factor weighs in favor of finding that the environment was custodial.  The police officers initiated contact with Peterson; he did not "take the initiative to offer statements" to investigators prior to them contacting him.  *Griffin*, 922 F.2d at 1351.  Although Peterson, like Davis, theoretically could have refused the officers' request given that they were not present at his location, he reports that he felt "forced" to adhere to their request as a result of the ongoing search of his residence.  Even if Peterson retained some degree of free will in making the decision to return home, the Court finds that he likely felt that he had little choice but to leave work after speaking with his employer.  Therefore, the Court will treat the third *Griffin* factor as supporting a finding of custody.

### 4.    Strong Arm Tactics

"Police deployment of strong arm tactics or deceptive stratagems during interrogation, number four in the list of indicia of custody enumerated above, is a practice widely condemned in American law."  *Id.*  Strong arm tactics can include confronting suspects with false or misleading witness statements, repeatedly lying to the suspect, or employing a good cop-bad cop routine.  *United States v. Beraun-Panez*, 812 F.2d 578,

580 (9th Cir. 1987).  Other deceptive or strong arm tactics include separating the suspect from nearby friends or family to deprive the suspect of outside support, utilizing persistent and relentless questioning, giving false legal advice to attempt to trick the suspect into confessing to a crime, or manipulating the suspect's insecurities about his or her surroundings.  *Miranda v. Arizona*, 384 U.S. 436, 455 (1966).

Peterson does not argue that the officers deployed these kinds of deceptive stratagems to elicit a confession or statement from Peterson, and the Court finds no evidence of such tactics.  Rather, Peterson's position is that the officers' seizure and search of his cellphone constituted a strong arm tactic, because he protested the seizure of the phone and agreed to a search of the phone so that it would not be seized.  Peterson maintains that "[t]his was all coercive, if not a strong-arm or deceptive stratagem." (Objections at 7.)

As a preliminary matter, the Court observes that no discussion of the phone[2] – and, therefore, no mention of any search or seizure of the phone – took place until more than twenty minutes into the interview.  Thus, even if the Court were to deem the cellphone search to be a "strong arm tactic," any statements Peterson made, or evidence the officers collected, before that point could not possibly have been tainted by it.  The first exchange about the phone, twenty minutes into the interview, was prompted by TFO Hanson stating, "I know you have an iPhone.  Do you mind if I take a look through that real

---

[2] At approximately sixteen minutes into the interview, Peterson mentions purchasing a smartphone as the reason he switched from a Hotmail email account to a Gmail account, but there is no conversation at that point in the interview about the content on the phone or the officers seeing or searching the phone.

quick?"   (Interview Recording at 20:33-20:35.)   On the recording of the interview, Peterson does not audibly respond as to whether the officers may look at the phone, but there are periods of silence suggesting that Peterson has handed the phone to the officers and they are looking at its contents.  This is followed by TFO Hanson stating, "Actually, do you mind if I pass this back to one of the forensics guys over there, in the garage?" (*Id.* at 21:10-21:14.)  Peterson responds, "Go ahead, there's nothing on that thing."  (*Id.* at 21:14-21:15.)   The Court finds that nothing was coercive or deceptive about this exchange.  TFO Hanson asked Peterson for permission to look at the phone and then transfer it to another officer, with no threats or promises accompanying the requests. Peterson appears to willingly hand over the phone to TFO Hanson and voluntarily consents to TFO Hanson giving the phone to another officer.  At that point, Peterson had no reason to believe that the officers were planning to hold his phone beyond the duration of the interview.   The Court concludes that no reasonable person would find the circumstances, at that point in the interview, to be coercive in a manner suggesting a custodial environment.

The cellphone is next discussed approximately forty-three minutes into the interview, when the officers are preparing to conclude the interview and Peterson requests that they return his phone before they leave.   Fifty-one minutes into the interview, TFO Hanson informs Peterson that the officers are going to keep the phone for "a few days" to thoroughly search it.  Peterson protests that he needs the phone and that there is no child pornography on it.  TFO Hanson appears to go back to the garage and

then returns with Peterson's phone, explaining that the officers had not found anything illegal on it and would not keep it for further searching.

Having reviewed the recording of the interview, the Court concludes that the officers' handling of Peterson's cellphone was never coercive or deceptive. TFO Hanson asked for Peterson's permission before taking and transferring the phone, and when Peterson protested that he needed his phone later in the interview, TFO Hanson was responsive to that concern and returned the phone. Because Peterson voluntarily turned over his phone and allowed an officer to search through it twenty minutes into the interview, under circumstances that the Court finds were not coercive, the Court determines that the officers did not use their possession of the phone as a strong arm tactic to coerce Peterson into confessing to illegal activity. Accordingly, the Court concludes that the search of Peterson's phone and any statements Peterson made in connection with the phone were not elicited through strong arm tactics or deceptive stratagems. In light of this conclusion and the fact that the Court finds no other evidence of strong arm tactics – nor does Peterson allege that there were any – the Court concludes that the fourth *Griffin* factor weighs against finding that Peterson was in custody at the time of the interview.

### 5. Police Domination of the Atmosphere

The fifth *Griffin* factor, police domination, focuses on "whether the entire context of the questioning, including such considerations as place and length of the interrogation, demonstrates that the course of the investigation was police dominated." *Griffin*, 922

F.2d at 1352.  The Court finds that the environment in Peterson's case was not dominated by police.  The interview took place at Peterson's kitchen table, in his home, with only two officers present (the others were in the garage, out of Peterson's view), both of whom were in plain clothes, and Peterson was told he could leave at any time.  From the recording, it appears that the officers never yelled at, threatened, or made promises to Peterson to coerce him to speak with them.

These facts are highly similar to those present in *United States v. Chase*, No. 11-150, 2011 WL 4954650 (D. Minn. Aug. 22, 2011).  In *Chase*, an FBI Special Agent and three local police officers arrived at the suspect's home to execute a search warrant.  2011 WL 4954650, at *7.  The officers informed the suspect that they would be searching his apartment for evidence of child pornography but that he was not under arrest and was free to leave or refuse to answer any questions.  *Id.*  The Special Agent and one other officer, both "dressed in casual street clothing," interviewed the suspect at his kitchen table for approximately 30-40 minutes.[3]  *Id.*  During that time, the officers did not yell at

---

[3] Peterson objects to the R&R's characterization of the length of the interview – specifically, whether the interview "only lasted 45 minutes" or over an hour.  The Court will overrule this objection.  The R&R states that "[t]he interview lasted approximately 45 minutes in total," (R&R at 3), and later cites an exchange about Peterson's cellphone taking place between fifty and fifty-six minutes into the audio recording.  After reviewing the audio recording of the interview and TFO Hanson's testimony before the Magistrate Judge, the Court concludes that the Magistrate Judge's characterization was not inaccurate or misleading.  The back-and-forth questioning lasted approximately forty-five to fifty minutes, and then the recording continued to pick up discussion about Peterson's phone, including a delay when TFO Hanson leaves the kitchen to discuss the matter with the officers outside the house.  Even if the subsequent conversations about the phone or small talk between Peterson and the Special Agent are included in the interview duration, the interview lasted for an hour and five minutes, rather than forty-five minutes, which does not alter the Court's conclusion that the atmosphere was not police-dominated.  *See Davis*, 778 F.2d at 171 ("Though the first [interview] session lasted approximately two hours, it was not a marathon session designed to force a confession.").

the suspect, threaten him, make promises to him, restrain him, or place him under arrest. *Id.* Based on those circumstances, the Magistrate Judge found that the environment was not police-dominated. *Id.* at *10. This Court then adopted the Magistrate Judge's recommendation that the defendant's motion to suppress be denied.

Based on the facts surrounding the search and interview in this case, which are very similar to those in *Chase*, the Court concludes that the fifth *Griffin* factor weighs against a finding of a custodial environment. None of the hallmarks of coercive police behavior or a police-dominated atmosphere is present in this case. Therefore, this factor supports finding that Peterson was not in custody during the interview.

### 6.    Arrest

The sixth *Griffin* factor is whether the subject was placed under arrest at the conclusion of the interview. This factor is the easiest to resolve: Peterson was not arrested on October 3, 2013. Therefore, the sixth indicium of a custodial environment is not present, and the final *Griffin* factor unequivocally weighs against a finding of custody in this case.

### 7.    Totality of the Circumstances

"The ultimate custody determination is based on the totality of the circumstances, with none of the above factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor." *United States v. Whitefeather*, No. 14-52, 2014 WL 1847785, at *3 (D. Minn. May 8, 2014). In Peterson's case, five of the six *Griffin* factors weigh decidedly against a finding of

custody.  The only factor weighing in favor of a custodial environment is that the police initiated the contact by calling Peterson's employer to request that he return home.  The Court concludes, however, that it is outweighed by the repeated statements by the police that Peterson need not remain at the house or answer questions, that his movement was in no way restricted, that the police did not dominate the environment or use strong arm tactics, and that Peterson was not placed under arrest.  Thus, the Court finds that Peterson was not in custody on October 3, 2013 and was not entitled to *Miranda* warnings before speaking with police.  The Court will overrule Peterson's objections, adopt the R&R, and deny Peterson's motions to suppress evidence seized and statements made during the October 3 search and interview.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, the Court **OVERRULES** Peterson's objection [Docket No. 47] and **ADOPTS** the Report and Recommendation of the Magistrate Judge [Docket No. 41].  **IT IS HEREBY ORDERED** that:

1.     Peterson's motion to suppress evidence obtained through illegal search and seizure [Docket No. 21] is **DENIED**;

2.     Peterson's motion to suppress statements [Docket No. 22] is **DENIED**.

DATED:  April 2, 2015
at Minneapolis, Minnesota.

s/ John R. Tunheim

JOHN R. TUNHEIM
United States District Judge